DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal is brought by the state of Ohio from a judgment of the Ottawa County Court of Common Pleas rendered in a criminal case against appellee, Michael A. Lather, Jr. The common pleas court granted Lather's motion in limine requesting the exclusion of the videotaped statements of Jeanett S. Horn from evidence at his trial on a charge of one count of possession of a controlled substance in an amount exceeding 100 grams, a violation of R.C. 2925.11(A).
 {¶ 2} Initially, Horn refused to provide a statement to the police and invoked her right to counsel. Nevertheless, she subsequently offered to give a statement. Consequently, on August 30, 2001, Horn, who was Lather's girlfriend, participated in a videotaped interview with three law enforcement officers. Before the first interview, a detective informed Horn of her rights under Miranda v. Arizona (1966), 384 U.S. 436. Horn waived those rights. Police officers conducted a second videotaped interview of Horn on September 25, 2001. Both interviews occurred in the apartment of the manager of Horn's apartment complex. Horn's statements provide the following relevant facts.
 {¶ 3} Horn resides in an apartment in Ottawa County, Ohio. Lather, who was dating Horn, occasionally spent the night at her apartment. According to Horn, she and Lather went to Cleveland in mid-August to visit one of Lather's friends. When they arrived at the friend's house, Lather escorted Horn into a bedroom and told her to watch television. Horn, however, had difficulty operating the television and, looking for help, went into the room where Lather was sitting with "three other dudes." At that time, she saw two big bags on the table. The bags contained a substance that looked like flour. Horn turned around and returned to the bedroom without speaking to Lather or the other men.
 {¶ 4} When they returned to Port Clinton, Lather dropped Horn off at her apartment. He returned three days later. While Horn went to see her friend, Regina Lee, who lives in the same apartment complex as Horn, Lather took a shower and a nap. Lather was arrested the following Friday in Fremont, Ohio, apparently on charges unrelated to the instant case, and placed in jail.
 {¶ 5} Two days later, on a Sunday, Horn decided to clean her utility room. She noticed that the box in which she stored her "George Foreman" grill was cracked open. She also "smelled something." Horn opened the box and removed a large package containing packets of a substance that was later determined to be cocaine. Horn showed the package to Lee. Uncertain of how to dispose of the package, Horn ultimately decided to go Sandusky, Ohio, where she knew someone who could value the cocaine. If she sold the package to that individual, she was going to use the proceeds to post bail for Lather. Even though the cocaine was valued at $17,000, Horn, fearing retaliation by Lather, decided not to sell it. Therefore, she returned home and put the package back into the box.
 {¶ 6} When Lather was released from jail the next day, he and his cousin, John, drove to Horn's apartment complex to see Horn. However, she was not at home. Because the Fremont police had his key to Horn's apartment, Lather and John then went to Regina Lee's apartment. Since he thought that Horn was out somewhere "trying to get rid of" the package of cocaine, Lather was very upset. Lee told him that she knew about the package, and he threatened her.
 {¶ 7} When Horn returned, she and Lather went to her apartment. Horn told him that she knew about the package, and Lather slapped her face, asking "What did you do with it?" Horn told him to get the package and get out of her house. Horn then went back to Lee's apartment, taking Lather's car keys with her. She told Lee not to allow Lather in Lee's apartment. In the meantime, John helped Lather gather his belongings. When the men attempted to gain access to Lee's apartment in order to obtain Lather's keys, Horn left by means of the back door and, once again, returned to her own residence. Because Lee refused to allow the two men access to her apartment, they left and went to Lee's sister's apartment. Her sister called the police.
 {¶ 8} When the police arrived at the apartment complex, they first stood outside talking. Lather and John went to Horn's apartment, got the box with the package in it, and carried it to Lee's apartment. Horn told them to put the box in the cabinet under Lee's kitchen sink. At that point, the police did not search either Horn's or Lee's apartments, and Horn, Lather, Lee, and John were allowed to leave together. They spent the night in Fremont. The next day, the police seized the box under Lee's kitchen sink[1]. Lather continued to threaten Horn and Lee, telling them that he would have them both killed. He also beat and choked Horn.
 {¶ 9} Horn later, in March 2002, allowed Lather's trial counsel to conduct a videotaped interview of her. In this interview, she claimed that the police threatened to charge her as a major drug offender. She also stated that she lied for her friend, Regina Lee, in the police interviews. According to Horn, Lee was the person who was in possession of the cocaine from the beginning; both women lied so that Lee would be able "to get her kids back."
 {¶ 10} After Horn was indicted on charges related to the possession of the cocaine, she refused to testify at Lather's trial and asserted her Fifth Amendment right to remain silent. Therefore, the state planned on showing the jury Horn's police interviews in lieu of her testimony. However, Lather's trial counsel filed a motion in limine in which he asked the trial court to exclude the interviews from evidence. The court granted this motion, finding that Horn was an accomplice; therefore, her statements to the police were presumptively unreliable pursuant to Lilly v. Virginia (1999), 527 U.S. 116 and State v. Madrigal (2000), 87 Ohio St.3d 378.
 {¶ 11} The state appeals pursuant to R.C. 2945.67 and Crim.R. 12(K), certifying that this appeal is not taken for the purpose of delay and that the trial court's ruling renders the state's proof so weak that any reasonable possibility of effective prosecution is destroyed. The state contends that the following error occurred in the proceedings below:
 {¶ 12} "The trial court erred in excluding out of court statements of declarant when the declarant is unavailable at trial pursuant to Evidence Rule 804(D)(3)[sic]."
 {¶ 13} The Sixth Amendment to the Constitution of United States, as made applicable to the states through the Fourteenth Amendment, guarantees an accused the right to confront the witnesses against him. Ohio v. Roberts (1980), 448 U.S. 56, 63. This right includes the right to physically face and cross-examine witnesses. Lilly v. Virginia,527 U.S. at 124; State v. Williams (1983), 4 Ohio St.3d 74, 75. Thus, although the hearsay rules and the Confrontation Clause "protect the same values, *** the prohibitions of the Confrontation Clause cannot be equated with the general rule prohibiting the admission of hearsay statements." State v. Gilliam (1994), 70 Ohio St.3d 17, 19, citing White v. Illinois (1992),502 U.S. 346. Rather, the Confrontation Clause excludes some evidence that may be admissible as a hearsay exception. Id., citing Idaho v. Wright (1990), 497 U.S. 805, 814.
 {¶ 14} Nevertheless, untested hearsay statements do not violate the Confrontation Clause if it is demonstrated that (1) the declarant is unavailable to testify at trial; and (2) the statements bear adequate "indicia of reliability." Ohio v. Roberts, 448 U.S. at 66. The reliability of a hearsay statement is satisfied if (1) "the evidence falls within a firmly rooted hearsay exception;" or (2) "it contains guarantees of trustworthiness." Id. at 66.
 {¶ 15} As applied to the present case, Horn is unavailable for the purpose of our analysis. See State v. Landrum (1990), 53 Ohio St.3d 107,113 (A declarant's invocation of his or her Fifth Amendment right renders the declarant "unavailable.") Id. Thus, the sole issue here is whether Horn's hearsay statements bear adequate indicia of reliability thereby rendering her statements "so trustworthy that adversarial testing can be expected to add little to reliability." White v. Illinois (1992).502 U.S. 346, 357.
 {¶ 16} The state acknowledges, in essence, that even though Horn's videotaped statements are statements made against her penal interest, these statements are not, pursuant to Lilly, a firmly rooted exception to the hearsay rule. We agree. In Lilly, the United States Supreme Court held that the statements of an accomplice or co-defendant are inherently unreliable and must be subject to cross-examination. Id. at 131. Thus, statements made by the declarant to the prosecution to establish the culpability of a criminal defendant do not fall into a firmly rooted hearsay exception. Id. at 134; State v. Madrigal,87 Ohio St.3d at 385-386. Accordingly, in the case before us, the presumption of the unreliability of Horn's statements can be rebutted only by "guarantees of trustworthiness."
 {¶ 17} In determining trustworthiness, the court must examine only those circumstances surrounding the making of the statements. State v. Issa (2001), 93 Ohio St.3d 49, 60 (Citation omitted). "It is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted *** when the government is involved in the statements' production, and when the statements describe past events and have not been subjected to adversarial testing." Lilly v. Virginia, 527 U.S. at 137. Further, the fact that other evidence corroborates the statements is not relevant to an analysis made under the Confrontation Clause. State v. Madrigal,87 Ohio St.3d at 387, citing Lilly v. Virginia, 527 U.S. at 138. Nor does the fact that the declarant is informed of his or her Miranda rights" render the circumstances surrounding the statements significantly more trustworthy." Id.
 {¶ 18} Applying Lilly and Madrigal to the case under consideration, we find that the trial court did not err in granting Lather's motion in limine. Despite the fact that Horn was not in police custody when she was interviewed, law enforcement officers participated in conducting the interviews. Horn was asked to describe past events through the use of many leading questions. Horn, who made some inculpatory statements, used those statements to establish Lather's guilt, which is exactly the action criticized in Lilly.
 {¶ 19} Horn also portrayed Lather as a violent man who would harm her if she did not comply with his wishes. The questioning detective used Horn's fear for her or her child's safety by telling her that Lather is a "bad, bad man" who "has already been to trial twice for attempted murder" and "beaten two sets of murder charges." The officer informed Horn that the only way she could feel safe was through her "complete cooperation." Finally, and despite the state's assertion to the contrary, Horn's statements were not subject to adversarial testing. Specifically, the statements made to Lather's attorney do not constitute the rigorous testing in the context of an adversarial proceeding required by the Confrontation Clause. Maryland v. Craig (1990), 497 U.S. 836, 845. Accordingly, the state failed to demonstrate that Horn's statements carry the guarantees of trustworthiness sufficient to rebut their presumption of unreliability.
 {¶ 20} For all of the foregoing reasons, the state of Ohio's sole assignment of error is found not well-taken. Therefore, the judgment of the Ottawa County Court of Common Pleas is affirmed. The state of Ohio is ordered to pay the costs of this appeal.
JUDGMENT AFFIRMED.
Peter M. Handwork, P.J., Richard W. Knepper, J., Judith Ann Lanzinger,J., JUDGE, CONCUR.
[1] It is unclear from the first videotaped statements as to how law enforcement officials learned of the presence of the box. However, in her statement to Lather's attorney, Horn indicates that the Port Clinton Police Department acted on information provided to them by Regina Lee.