STATE of Wisconsin, Plaintiff-Respondent,

v.

Edward A. MURILLO, Defendant-Appellant.†

Court of Appeals

*No. 00–0812–CR. Submitted on briefs November 9, 2000.—Decided December 20, 2000.*

## 2001 WI App 11

(Also reported in 623 N.W.2d 187.)

†Petition to review denied.

668

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Craig W. Albee* of *Glynn, Fitzgerald & Albee, S.C.* of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Chris R. Larsen,* assistant attorney general, and *James E. Doyle,* attorney general.

Before Brown, P.J., Nettesheim and Snyder, JJ.

¶ 1. BROWN, P.J. In this appeal, we examine the scope of the declaration against the social interest exception to the hearsay rule. We also examine whether the admission of a brother's statement on grounds that it was against his social interest violated the defendant's right of confrontation where the brother would not take the stand and the statement inculpated the defendant. We hold that the trial court properly ruled that the statement given by defendant Edward (Eddie) Murillo's brother, Luis, was admissible under the social interest exception to the hearsay rule. We further hold that the exception is not a firmly rooted exception to the hearsay rule. Therefore, its admission would violate Eddie's confrontation right unless there are otherwise "particularized guarantees of trustworthiness." But we hold that such guarantees existed here. We affirm the admission of Luis's statement. In another issue, we hold that the trial court properly exercised its discretion in permitting an anonymous jury to be impaneled. We affirm Eddie's convictions for being a party to first-degree intentional

homicide while armed, intentionally giving a danger-ous weapon to a child and possession of a firearm by a felon.

¶ 2.  The facts are as follows. Santiago Herrera was murdered by gunshot while standing on the porch of his home. Zebulon Robinson, a minor at the time of the incident, told police about the events leading to Herrera's death. Robinson related that he went to Herrera's house to buy marijuana. While he and Herrera were standing on Herrera's porch, Eddie, Luis and Mario Garcia, all members of the La Familia gang, approached the house. Eddie pointed a gun at Robinson and told him to get off the porch. Eddie then said something like "you Kings don't run nothing over here no more so get off our block" and shot Herrera. Eddie then handed the gun to Robinson and told him to get rid of it.

¶ 3.  Police then arrested Luis and questioned him. Before the interview began, Luis was read his *Miranda*[1] rights as the police considered him a suspect in the shooting. Luis initially told the police he was not in the area of the shooting, but was with his girlfriend watching television. The officer left the interview room and when he returned he told Luis that he had checked with the girlfriend and his story did not hold up. Luis became more nervous and told the police that he was near the shooting and saw those involved running but did not do anything.

¶ 4.  After a break, Luis became increasingly upset and according to the officer was crying, pacing, praying and collapsing. It is very important to the rest of this opinion to tell exactly what the officer related. Therefore, we now quote the officer's trial testimony.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

PROSECUTOR: [W]hen you went back in [to interview Luis] after the 20 minute break did you make any observations about how Luis Murillo was acting?

OFFICER: Yes.

PROSECUTOR: What did you observe?

OFFICER: He was very emotional, very upset and very afraid. He was alternately crying with tears just literally streaming down his face, pacing, his voice was cracking. He asked me several times what do I do. He collapsed on the floor a number of times where he just dropped. He just dropped and was in a position—in a seated position on the floor. There were a couple of times he was in a praying position on his knees with his elbows on the chairs, clasped his hands and appeared to be praying and the entire time he was continually sobbing and crying.

. . . .

PROSECUTOR: Now, when you went back in after the 20 minute break, did Luis express any concerns to you about testifying?

POLICE: He was afraid to testify against his brother.

¶ 5. Luis then told the officer that he saw Eddie shoot Herrera. Luis signed a written statement to that effect. Eddie was arrested and charged with first-degree intentional homicide while armed (which was later amended to contain a charge of party to the crime of homicide), intentionally giving a dangerous weapon to a child and possession of a firearm by a felon.

¶ 6. Before trial, Luis was deposed, but he refused to testify, asserting his Fifth Amendment right against self-incrimination. The State granted him immunity, but he still refused to testify and was held in

contempt. Eddie filed a motion to exclude Luis's statement, assuming that Luis would refuse to testify at trial, on the grounds that it was hearsay and that admitting it violated his right to confront Luis. The trial court denied the motion, holding that the statement was admissible under WIS. STAT. § 908.045(4) (1997–98),[2] under both the penal interest exception and social interest exception. It further held that Eddie's confrontation right was not violated.

¶ 7.  According to the trial court, Luis's statement was against his penal interest because it exposed him to obstruction charges as Luis initially told police that he was not in the area of the shooting. The trial court also opined that the statement was against Luis's social interest because, considering how upset Luis was and the fact that he was turning in his brother, a reasonable person in Luis's position would not have made the statement unless it was true. As to Eddie's confrontation right claim, the trial court determined that the social interest exception is firmly rooted in Wisconsin and, therefore, admitting the statement did not violate Eddie's Sixth Amendment right.

¶ 8.  At trial, Luis again asserted his Fifth Amendment right and was offered immunity but still would not testify. A police officer read Luis's statement into evidence. Eddie was convicted on all counts. On appeal, Eddie renews his argument that Luis's statement was inadmissible because it was hearsay. Further, even if the statement was admissible as an exception to the hearsay rule, Eddie continues to argue that its admission violated his Sixth Amendment right to cross-examine Luis.

---

[2] All references to the Wisconsin Statutes are to the 1997–98 version.

¶ 9. We initially address Eddie's claim that Luis's statement is inadmissible hearsay because it does not fall under one of the exceptions to the hearsay rule. We will not reverse a trial court's decision to admit hearsay evidence unless the trial court erroneously exercised its discretion. *See State v. Stevens*, 171 Wis. 2d 106, 111, 490 N.W.2d 753 (Ct. App. 1992). Although the trial court held that the statement was admissible under both the penal interest exception and the social interest exception, we need only discuss the social interest exception since we agree with the trial court that Luis's statement was against his social interest.

¶ 10. WISCONSIN STAT. § 908.045(4) contains what is commonly known as the social interest exception:

> **908.045 Hearsay exceptions; declarant unavailable.**
>
> . . . .
>
> **(4)** STATEMMENT AGAINST INTEREST. A statement which was at the time of its making . . . so far tended to . . . make the declarant an object of hatred, ridicule, or disgrace, that a reasonable person in the declarant's position would not have made the statement unless the person believed it to be true. . . .

The Federal Rules of Evidence do not recognize this exception; some states recognize it and some do not. In only one other Wisconsin case, *Stevens*, 171 Wis. 2d at 112–18, has an appellate court discussed this exception in detail.

¶ 11. Hearsay statements which subject the declarant to "hatred, ridicule and disgrace" are admissible under this exception "based on the psychological

assumption that persons do not make statements which are damaging to themselves unless satisfied for good reason that they are true." *Id.* at 113. Stated another way, because encountering "hatred, ridicule and disgrace" is such an unpleasant experience, few would subject themselves to it by making a particular statement unless the statement was true.

¶ 12. It is appropriate at this point to quote from a work by noted evidence scholar Edward J. Imwinkelried concerning this exception to the hearsay rule:

> It is not enough that the declarant believes that the revelation might trigger a mild community reaction. The declarant must fear that the disclosure will pose a direct and palpable threat. . . . Given the rationale for the declaration against social interest exception, in principle the admissibility of the proffered statement turns on the declarant's subjective state of mind. The issue is not whether the revelation subsequently renders the declarant an object of hatred, ridicule or disgrace. The issue is not even whether, at the time of the statement, there was an objective probability that the disclosure would have that effect. The focus is on whether the declarant is in a truthful frame of mind when the declarant speaks. The declarant's actual, subjective state of mind controls. The declarant's awareness of a supposed threat to an interest is the key to inferring [his or] her sincerity. . . .
>
> Of course, it is often difficult to prove a person's subjective state of mind. For that reason, courts employ an objective standard. They treat the state of mind of the hypothetical, reasonable person as circumstantial evidence of the actual declarant's subjective frame of mind. They initially inquire whether a hypothetical, reasonable person would have viewed the revelation as disserving; and

absent unusual circumstances, they presume that the declarant had the same state of mind as the hypothetical, reasonable person.

Edward J. Imwinkelried, Declarations Against Social Interest: The (Still) Embarrassingly Neglected Hearsay Exception, 69 S. CAL. L. REV. 1427, 1432–34 (May 1996).

¶ 13.　We learn from Imwinkelried that most jurisdictions purport to incorporate an objective test because determining the declarant's subjective state of mind is often difficult, but do so by looking at what a reasonable person in the declarant's position would feel. Wisconsin is one of these jurisdictions. WISCONSIN STAT. § 908.045(4) considers whether a *reasonable person in the declarant's position* would not have made the statement unless the person believed it to be true." (Emphasis added). But we also learn from Imwinkelried that, notwithstanding the statute's wording, most courts consider the declarant's "actual, subjective motivation" when it is known. *See* Imwinkelried, *supra*, at 1434.

¶ 14.　The smoking gun in this analysis is supplied by the McCormick treatise: "It can scarcely be doubted . . . that statements of [the] declarant disclosing his or her . . . actual mental state would be received and would control in an appropriate case." 2 McCORMICK ON EVIDENCE § 319 at 347–48 (4th ed. 1992). Thus, if the court can divine the declarant's actual state of mind by learning about the declarant's demeanor—words and actions surrounding the giving of the statement—that will go a long way toward determining the admissibility of the statement on grounds that it was against the declarant's social interest.

¶ 15.　We applied this analysis in *Stevens*. We wrote that we would consider the declarant's subjective

state of mind, if known. *See Stevens,* 171 Wis. 2d at 114 ("[T]here is both an objective and a subjective pole to the social interest exception. The objective pole is the determination that the declarant actually faced a risk of hatred, ridicule or disgrace. *The subjective pole concerns the declarant's appreciation of the risk of hatred, ridicule or disgrace.*") (Emphasis added.)

¶ 16.   Thus, in considering whether the trial court was correct in applying the social interest exception here, we look to whether the trial court had a window into Luis's subjective state of mind. In other words, does the record underlying the trial court's discretionary choice show Luis's *awareness or belief* that making a statement undermined his interest? An affirmative answer is the key to determining the declarant's sincerity.

¶ 17.   We are convinced that Luis's actual state of mind was on display in testimony before the trial court. Here was Luis, faced with the difficult dilemma of whether to turn in his brother, a fellow gang member to boot. It is not difficult to ascertain that a reasonable person in Luis's position would feel he or she would be the object of "hatred, ridicule or disgrace" from family members and members of the gang. A reasonable person in Luis's position would understand that those who Luis is most likely to interact with and hold in high esteem would probably perceive him as disloyal and his act as one of betrayal if he told police what he knew. Eddie would resent Luis for turning on him. The family would likely hold Luis responsible for separating Eddie from the family if Luis told the police what happened. Luis's fellow gang members would likely be angered by Luis's conduct. Therefore, the objective prong is satisfied.

¶ 18.  That all of these considerations were weighing heavily on Luis's mind is evidenced by his actions, words and demeanor just prior to giving his statement. The testimony of the interrogating officer is riveting. Luis is crying "with tears just literally streaming down his face, pacing, his voice was cracking." He is seen begging the officer for advice about what to do. He collapses on the floor a number of times. He "just dropped," assuming a seated position on the floor and a praying position on his knees. He appears to be praying and, the entire time, he is continually sobbing and crying.

¶ 19.  These are not the actions of a person who is about to lie. These are the actions of a person who is torn between telling the truth and risking the disgrace of family and gang members or keeping quiet. The trial court was able to gain insight into Luis's actual mental state and so have we. The subjective prong is satisfied. We are convinced that Luis realized that the revelation would make him the subject of hatred, ridicule or disgrace. He understood that the disclosure would pose a direct and palpable threat to him. We are satisfied that Luis would never have given the statement if it were untruthful. We affirm the trial court's admission of the statement as an exception to the hearsay rule on grounds that it was a statement given against Luis's social interests.

¶ 20.  Our preceding discussion also drives Eddie's next issue. Eddie contends that even if Luis's statement was admissible under the social interest exception, admitting it violated Eddie's Sixth Amendment right to confront a witness against him. For this, Eddie relies on the United States Supreme Court decision in *Lilly v. Virginia*, 527 U.S. 116 (1999), which he

believes is on all-fours with the facts and circumstances of his case. We will discuss *Lilly* and then show how different this case is from *Lilly*.

¶ 21. Benjamin Lilly, Mark Lilly and Gary Barker were involved in a number of robberies, and one of them shot and killed Alex DeFilippis. *See id.* at 120. When the police questioned Mark, he initially stated that he stole alcohol during the first two robberies, handled a gun and was present during the other robberies and the homicide. *See id.* at 121. Police told Mark that he would be charged with burglary and that unless he broke family ties, his brother might drag him into a life sentence. *Id.* Mark then stated that he had nothing to do with the shooting of DeFilippis and that his brother shot him. *Id.*

¶ 22. A plurality of the Court analyzed the law as follows: In criminal prosecutions the defendant has a Sixth and Fourteenth Amendment right "to be confronted with the witnesses against him." *Id.* at 123 (citations omitted). "The central concern of the Confrontation Clause is to ensure the *reliability* of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Id.* (citation omitted) (emphasis added). When the State seeks to admit a hearsay statement of an unavailable declarant, the court must decide whether the Confrontation Clause allows the State to deny the defendant his or her usual right to force the declarant "to submit to cross examination, the 'greatest legal engine ever invented for the discovery of truth.'" *Id.* (citation omitted).

¶ 23. The *Lilly* Court announced a two-prong test for determining when the hearsay statement of an unavailable declarant is admissible. If the hearsay

falls within a firmly rooted hearsay exception, it is automatically admitted, as such statements are reliable even without cross-examination. *See id.* at 124–25. If the hearsay does not fall within a firmly rooted hearsay exception, it is only admissible if it contains "particularized guarantees of trustworthiness." *See id.* at 125. The Court then held that the penal interest exception is not a firmly rooted hearsay exception, *see id.* at 134, and the circumstances surrounding Mark's statement did not indicate that it contained particularized guarantees of trustworthiness. Therefore, the Court determined that Mark's statement was inadmissible. *See id.* at 139–40.

¶ 24.  Applying *Lilly* to this case, the first consideration, therefore, is whether the social interest exception is firmly rooted. The State concedes that Luis's statement is not automatically admitted because the social interest exception is not a firmly rooted hearsay exception.[3] We accept the concession for reasons stated in the footnote.

---

[3] In *Lilly*, the Court stated that firmly rooted hearsay exceptions have "longstanding judicial and legislative experience" and "rest on such a solid foundation that admission of virtually any evidence within it comports with the 'substance of the constitutional protection.' " *Lilly v. Virginia*, 527 U.S. 116, 126 (1999) (citations omitted). For example, spontaneous declarations is a firmly rooted hearsay exception because it is at least two centuries old, widely accepted among the states and has substantial guarantees of trustworthiness. *See id.* According to the Court, the penal interest exception is not firmly rooted because it is not generally based on the maxim that statements made without a motive to reflect the legal consequences of one's statement, and in situations that are exceptionally conducive to veracity, lack the dangers of inaccuracy that typically accompany hearsay. The exception rather is founded on the broad assumption "that a person is unlikely to fabricate a statement

¶ 25.  This brings us to the second consideration, that being whether Luis's statements contain particularized guarantees of trustworthiness. And here we see a world of difference between the facts surrounding Luis's statements and the facts surrounding Mark Lilly's statement. First, there is the obvious about Luis's statements, actions and demeanor, which we have already gone into at great length in order to demonstrate his actual state of mind. Even the closest reading of *Lilly* reveals nothing showing Mark's actual state of mind when he gave his statement implicating his brother. We know that Mark's statement was admitted as a statement against his penal interest, not as a statement against his social interest. So, the mere fact that Mark was Benjamin's brother was not central to the Court's analysis, unlike the case here. We know that Mark's statements came in response to an interrogating officer's leading questions, unlike Luis's statements. We know that because Mark was up to his neck in criminal involvement, he had what the Court described as a "natural motive" to exculpate himself as much as possible, unlike Luis. We note that Mark was under the influence of alcohol, unlike Luis.

¶ 26.  Eddie argues that the facts of this case are just like the facts of *Lilly*. Eddie is wrong. The only thing that connects the two cases is that both Mark and Luis were brothers of the person they turned against. While we agree with Eddie that suspects have a natu-

against his own interest at the time it is made." *Id.* at 126–27 (citation omitted). Similarly, the social interest exception is also based on the assumption that a person is unlikely to fabricate a statement against his own interest, *see State v. Stevens*, 171 Wis. 2d 106, 113, 490 N.W.2d 753 (Ct. App. 1992), and therefore is not a firmly rooted hearsay exception.

ral motive to shift the blame to each other rather than tell the truth, we have more information here which convinces us, as it convinced the trial court, that Luis's statement was not borne out of any motive to shift the blame. We affirm the trial court's denial of Eddie's contention that his Sixth Amendment right to confrontation was violated.

■

¶ 27. Finally, Eddie asserts that the court improperly exercised its discretion by referring to jurors by number rather than name. In *State v. Britt*, 203 Wis. 2d 25, 34, 553 N.W.2d 528 (Ct. App. 1996), we held that the trial court may exercise its discretion and take "reasonable steps to protect the identity of potential jurors in a criminal case." The trial court may allow anonymity if there is "strong reason to believe that the jury needs protection," and if the court takes "reasonable precautions to minimize any prejudicial effect to [the defendant] and to ensure that his fundamental rights to a fair and impartial jury were protected." *Id.* at 34, 36 (citation omitted). While anonymous juries are rare, they have been used in criminal cases, most often involving organized crime, drug-related activity or gang activity. *See id.* at 32. Courts have approved the use of an anonymous jury if it is necessary to protect potential jurors and their families from harassment, intimidation, bribery, publicity and other potential interferences that might make an individual afraid or apprehensive about being on a jury. *See id.*

¶ 28. In *Britt*, the victim and witnesses were threatened or were afraid to testify in a trial against a gang member who shot and paralyzed another. *See id.* at 35. The prosecutor asked that the names, addresses and places of employment of potential jurors not be revealed in open court on the record. *See id.* at 30. This

court held that the trial court properly exercised its discretion, noting that "this pattern of victim intimidation presented sufficient grounds to reasonably believe that the jury might also be subject to tactics of fear and intimidation." *Id.* at 35. Moreover, the trial court took reasonable precautions to minimize prejudice and protect the defendant's rights by allowing the parties to ask general questions about the jurors' residence and employment in open court and on the record. *See id.* at 36. Also, the parties were allowed prior access to written questionnaires in which the jurors presumably answered these questions. *See id.* at 37.

¶ 29.   Eddie argues that an anonymous jury was inappropriate in this case because the evidence of gang involvement was "thin to non-existent" and, unlike *Britt*, there was no evidence that the gang was acting in an obstructive manner which might cause the jurors to fear for their safety. We disagree. There was evidence of gang involvement in this case; Robinson testified that Eddie, Luis and Mario were members of the La Familia gang, and Mario was taken into custody wearing La Familia colors. Furthermore, evidence indicated that gang members were obstructing justice and instilling fear in witnesses who were supposed to testify at trial. The record contains a police officer's statement indicating that gang members in the city of Racine were afraid to testify against members of their own gang for fear of retaliation, including anything from beatings to shootings. As support for this proposition, the statement claimed that Luis, with the help of fellow gang members, was evading the police after giving his statement. The jury learned that Luis would not testify and was afraid of his brother. Also, Robinson told the police he was afraid to testify for fear of retaliation.

¶ 30.  Robinson's trial testimony that Eddie said, "you Kings don't run nothing over here no more so get off our block" indicates that the shooting may have been retaliatory in nature over a territory dispute between the La Familia gang and the Latin Kings gang. *Britt* indicated that the retaliatory nature of gang criminal activity may justify an anonymous jury. *See id.* at 35–36 (citing *State v. Bowles*, 530 N.W.2d 521, 531 (Minn. 1995) (once evidence was admitted that the victim's murder was retaliatory in nature, jurors could have reasonably concluded that were they to convict the defendant, they or their families would be vulnerable to harassment or retaliation from gang members)).

¶ 31.  In summary, the obstruction of justice, intimidation of witnesses and retaliatory nature of this crime provide sufficient grounds for reasonable jurors to conclude they too might be subjected to intimidation. The record supports the empanelment of an anonymous jury.

¶ 32.  We also conclude that the trial court took reasonable precautions to minimize prejudice and protect Eddie's rights. The only information not revealed in open court was the name of the jurors. While Eddie may have a right to obtain sufficient information regarding potential jurors to uncover bias, *see Britt*, 203 Wis. 2d at 37–38, this right was hardly restricted by not being able to use the jurors' names in open court. A name reveals little if anything about one's biases. Furthermore, any prejudice that Eddie may have faced by the insinuation to the jurors that their names were not revealed in open court because Eddie was "danger-

ous" and therefore probably guilty was minimized by the limited anonymity of the jury.

*By the Court.*—Judgment affirmed.