# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 04-2202

EDWARD A. MURILLO,

*Petitioner-Appellee,*

v.

MATTHEW J. FRANK, Secretary, Wisconsin
Department of Corrections,

*Respondent-Appellant.*

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01-C-1285—**William C. Griesbach**, *Judge.*

_____

ARGUED JANUARY 18, 2005—DECIDED APRIL 1, 2005

_____

Before POSNER, EASTERBROOK, and ROVNER, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Santiago Herrera was shot and killed in 1998. He was a casualty of a conflict between the Latin Kings (Herrera's gang) and La Familia about what in antitrust law would be called exclusive retail sales territories. Zebulon Robinson, who had been negotiating to purchase marijuana from Herrera, saw the murder and at trial identified as the shooter Edward Murillo, one of three members of La Familia who had approached Herrera and

proclaimed that La Familia owned the territory. Robinson's word was of uncertain reliability—he had been engaged in an illegal drug transaction, his recollection of events changed over time, and, worse, he had taken the murder weapon to a friend to hide, though he testified that the assassin had tossed him the gun while fleeing. So the prosecutor wanted additional evidence. The state called Luis Murillo, Edward's brother. But Luis refused to testify, even after receiving immunity from prosecution and being held in contempt for his intransigence. With Luis unavailable, the prosecutor offered—and the judge admitted, over an objection based on the Constitution's confrontation clause—a statement that Luis had made during custodial interrogation six days after Herrera's death.

Luis told the police a series of lies. First he denied being anywhere near the murder. He had been with his girlfriend at the time, Luis asserted. An officer checked out the story (or pretended to) and told Luis that his alibi did not hold up. Moreover, the officer said, a Crime Stoppers tip had placed Luis at the scene. Luis then said that he had indeed been nearby and had seen the perpetrators running away, but that he had nothing to do with the crime. During the interrogation Luis became increasingly upset and nervous, breaking into tears when the officers refused to accept his version of events. After still more attempts at evasion, Luis stated that he had seen his brother Edward approach Herrera and pull the trigger. Luis signed an affidavit to that effect. But Luis denied being one of the triad who had approached Herrera; how he could have seen the events so clearly, if he had not been part of the delegation, he did not reveal. (Luis said in his statement and affidavit that Robinson was the third member of the group; Robinson testified that Luis was the third.)

The jury convicted Edward of first degree murder and two firearms offenses. He was sentenced to life imprisonment. Wisconsin's intermediate appellate court affirmed, rejecting

his argument under the confrontation clause, see 240 Wis. 2d 666, 623 N.W.2d 187 (2000), and the Supreme Court of Wisconsin declined to hear the case. Edward fared better on federal collateral review under 28 U.S.C. §2254. The district court issued a writ of habeas corpus in his favor, concluding that the state judiciary's decision was contrary to *Lilly v. Virginia*, 527 U.S. 116 (1999), a decision that the district judge viewed as on all fours, right down to fact that the declarant was the defendant's brother. 316 F. Supp. 2d 744 (E.D. Wis. 2004). Wisconsin contends in this court that *Lilly* is distinguishable because the statement there had been admitted on the ground that it was against the declarant's penal interest, while admission of Luis's affidavit rests on the ground that it undercut his social interest. Wisconsin is among those states (a distinct minority) that deem a declaration against "social interest"—that is, a statement that shames the speaker in his community—an exception to the hearsay doctrine. See Wis. Stat. §908.045(4); Thomas J. Imwinkelreid, *Declarations Against Social Interest: The (Still) Embarrassingly Neglected Hearsay Exemption*, 69 S. Cal. L. Rev. 1427 (1996). The idea is that Luis's statement violated the social norm of solidarity among gang (and family) members, so that Luis would not have accused Edward unless the accusation were true.

Wisconsin's judiciary used the framework of *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), which stated that hearsay is compatible with the confrontation clause when supported by (1) a "firmly rooted hearsay exception" or (2) "particularized guarantees of trustworthiness". The state acknowledges that the "social interest" doctrine is novel rather than established by force of history but contends that it satisfies *Roberts*'s second option and insists that *Lilly* does not hold otherwise.

If this question were to arise today, the governing decision would be *Crawford v. Washington*, 124 S. Ct. 1354 (2004), rather than *Roberts* or *Lilly*. The Court held in *Crawford*

that, when testimonial declarations (such as affidavits or formal confessions) are at issue, judicial assessments of reliability never suffice and that an opportunity to cross-examine the declarant is essential. Edward was unable to cross-examine Luis, so *Crawford* amounts to a *per se* rule that his statement and affidavit were inadmissible. But *Crawford* was not issued until after Edward's conviction became final through the conclusion of direct review, and the district court held that it could not be applied retroactively on collateral attack. 316 F. Supp. 2d at 749-50. Edward defends the judgment in his favor by asking us to apply *Crawford*, which would avoid any need to consider *Roberts* and *Lilly*.

The parties debate whether *Crawford* applies retroactively under *Teague v. Lane*, 489 U.S. 288 (1989), and its successors—most recently, *Schriro v. Summerlin*, 124 S. Ct. 2519 (2004), and *Beard v. Banks*, 124 S. Ct. 2504 (2004). Section 2254(d)(1) says that the writ shall not issue unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States". A natural reading of §2254(d)(1) is that the only federal law that matters is the law that had been "clearly established" when the state court is called on to decide. See *Williams v. Taylor*, 529 U.S. 362, 390, 412 (2000); *Gosier v. Welborn*, 175 F.3d 504, 510 (7th Cir. 1999) ("§2254(d)(1) means that only rules articulated by the Supreme Court of the United States *before* the state court rendered its decision may be applied on collateral review. Section 2254(d)(1) differs from *Teague* because the new statute closes the escape hatches in *Teague*") (emphasis in original). See also *Ramdass v. Angelone*, 187 F.3d 396, 406 (4th Cir. 1999); Randy Hertz & James S. Liebman, 2 *Federal Habeas Corpus Practice & Procedure* §32.3 at 1430 (4th ed. 2001).

There *is* a provision for giving effect to retroactive legal changes, but it lies in §2244(b)(2)(A) and depends on the

Supreme Court's own declaration that its decision meets the *Teague* standard. See, e.g., *Tyler v. Cain*, 533 U.S. 656 (2001). The Supreme Court has not held that *Crawford* applies retroactively on collateral review. Because the Supreme Court rarely decides retroactivity as part of the original opinion, reading §2254(d)(1) to prevent any other court from making the retroactivity decision would mean that the year allowed to initiate a collateral proceeding often would expire. The Supreme Court may decide in *Dodd v. United States*, cert. granted, 125 S. Ct. 607 (2004) (argued March 22, 2005), whether prisoners bear the risk of delay until a retroactivity decision can be made. While waiting for the outcome of *Dodd*, we deem it best to address how *Crawford* is classified under *Teague*. Unless *Crawford* meets the *Teague* standard for retroactivity, whether §2254(d)(1) allows a court of appeals to make its own retroactivity assessment is unimportant.

*Teague* and its successors say that a new rule of constitutional law is retroactive on collateral attack only if it places certain conduct beyond the reach of the criminal law (that is, establishes that the defendant's acts were not subject to punishment) or if it establishes one of the rare "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *O'Dell v. Netherland*, 521 U.S. 151, 157 (1997). Three courts of appeals have held that *Crawford* is not retroactive under this approach. *Mungo v. Duncan*, 393 F.3d 327 (2d Cir. 2004); *Dorchy v. Jones*, 398 F.3d 783, 788 (6th Cir. 2005); *Brown v. Uphoff*, 381 F.3d 1219, 1226-27 (10th Cir. 2004). One court has held that *Crawford* is retroactive— though not by application of the *Teague* standard. *Bockting v. Bayer*, 2005 U.S. App. Lexis 3012 (9th Cir. Feb. 22, 2005). The three judges in *Bockting* wrote separately. Judge Noonan concluded that *Crawford* applies on collateral review because it did not change the law. Judge McKeown concluded that *Crawford* did change the law, and changed it so dra-

matically that it established a "watershed rule" that applies retroactively. Judge Wallace agreed with Judge McKeown that *Crawford* changed the law but disagreed with her understanding of *Crawford*'s fundamentality. He saw it as an ordinary development in criminal procedure that like almost all other such changes applies prospectively. We agree with this perspective and thus follow *Mungo*, *Dorchy*, and *Brown*.

It is obvious to us—as it was to a prior panel, see *Owens v. Frank*, 394 F.3d 490, 501 n.8 (7th Cir. 2005)—that *Crawford* establishes a new rule. It discards the framework that *Roberts* had adopted. True enough, as Judge Noonan observed, *Crawford* did not say that it was overruling *Roberts*; it emphasized that the declarant in *Roberts* had been subject to cross-examination. But it assuredly (and explicitly) jettisoned the *Roberts* standard. 124 S. Ct. at 1373. All of the Supreme Court's decisions between *Roberts* and *Crawford* had applied that understanding, though some of the Justices had questioned whether it should be maintained. *Lilly* provides a good example. Seven Justices asked and answered the *Roberts* questions (disagreeing four to three about their resolution); two wrote separately to stake out a different position. A rule is "new" for retroactivity analysis unless it was dictated by earlier decisions. See *Banks*, 124 S. Ct. at 2511. *Crawford* was not "dictated" by *Roberts* or *Lilly*; it broke from them. That the break takes the form of a return to an older, less flexible but historically better grounded approach does not make it less a break. All constitutional decisions find their ultimate basis in texts adopted long ago—here in the Bill of Rights (1791) and their application to the states via the fourteenth amendment (1868). Judicial rhetoric routinely invokes older norms. This does not mean that there has been no "new rule" of constitutional criminal procedure since 1868.

Whether *Crawford* adopts a fundamental rule essential to a fair and accurate trial is a subject that we pretermitted in *Owens*. Like the second, sixth, and tenth circuits (and Judge

Wallace in *Bockting*), we think the answer a straightforward
"no." The Supreme Court has not identified *any* decision,
other than *Gideon v. Wainwright*, 372 U.S. 335 (1963), that
would be so profound. It has repeatedly declined invitations
to treat one or another decision as a "watershed rule,"
including both *Banks* and *Summerlin* last Term. *Summerlin*
holds that *Apprendi v. New Jersey*, 530 U.S. 466 (2000),
surely a more sweeping change than *Crawford* (and more
important to defendants, too, because it entitles them to a
jury decision, while *Crawford* affects only what evidence the
jury hears), is not retroactive on collateral attack. See also
*McReynolds v. United States*, 397 F.3d 479 (7th Cir. 2005).

Indeed, it would be a close question whether *Crawford*
helps or hinders accurate decisionmaking. Live testimony
is preferable to affidavits and transcribed confessions, be-
cause cross-examination can probe its weaknesses, but re-
corded testimony may be better than silence, when death or
incapacity or threats or loyalty to one's confederates keep
witnesses off the stand. The point of *Crawford* is not that
only live testimony is reliable, but that the sixth amendment
gives the accused a right to insist on live testimony, whether
that demand promotes or frustrates accuracy. Like the self-
incrimination clause and other provisions in the Bill of Rights,
the confrontation clause can be invoked to prevent the
conviction of persons who are guilty in fact. What *Crawford*
holds is that defendants enjoy this right *even when the
hearsay is trustworthy*. This is not an indispensable
innocence-protecting decision that must be applied retroac-
tively to criminal prosecutions that have already been
finally resolved on direct review.

There is another way to see the point. Violation of a truly
vital rule of criminal procedure, such as entitlement to
counsel (the holding of *Gideon*) leads to reversal without
inquiry into harmless error. See *United States v. Cronic*,
466 U.S. 648 (1984). Violations of other, less fundamental
rules are subject to harmless-error analysis. The confronta-

tion clause is in the latter category; courts regularly examine evidence admitted without cross-examination to determine whether the error was harmless. See *Delaware v. Van Arsdall*, 475 U.S. 673, 682 (1986). This shows, as the tenth circuit observed in *Brown*, that *Crawford* cannot have established the sort of indispensable doctrine that applies retroactively even to closed cases.

Let us return, then, to how the Court understood and applied the *Roberts* framework in *Lilly*. Virginia charged Benjamin Lilly with homicide. The evidence against him included a statement by his brother Mark, who (like Luis Murillo) refused to testify at trial. Mark's statement conceded that he had participated in the crime by helping to steal the gun that Benjamin used in the slaying, and that he had been present when Benjamin shot the victim. The statement was to this extent against Mark's penal interest. Mark went on, however, to say that Benjamin had committed the murder without his encouragement or approval. This portion of the statement exculpated Mark at Benjamin's expense, and the Court held that it could not be used against Benjamin. (We refer to Justice Stevens's opinion as that of "the Court." Because Justices Scalia and Thomas proposed to exclude statements such as Mark's categorically, the position that was to prevail in *Crawford*, the plurality opinion joined by Justices Stevens, Souter, Ginsburg, and Breyer was the most narrow ground of decision and hence constitutes the holding. See *Marks v. United States*, 430 U.S. 188, 193 (1977).)

The Court first concluded that declarations against penal interest given during custodial interrogation (as opposed to, say, declarations during and in furtherance of a conspiracy) may be introduced by, but not against, an accused. 527 U.S. at 131-34. This followed, Justice Stevens explained, from many decisions, perhaps most prominently *Bruton v. United States*, 391 U.S. 123 (1968), which had held that one defendant's confession that inculpates another may not be used

at a joint trial (unless the defendant who confessed also testifies), because it deprives the co-defendant of an opportunity to cross-examine the confessing defendant. If the confession, surely against the defendant's penal interest, must not be used when the declarant is in the courtroom but refuses to testify, it cannot be used when the declarant has not been charged with crime in the first place, the Court held.

That left the question whether Mark's statement could be used nonetheless on the ground that its self-inculpatory portions demonstrated its truthfulness. The Court held not, 527 U.S. at 135-39, in part because attempts to evade or minimize blame by pointing fingers at others tend to be unreliable and in part because "[i]t is highly unlikely that the presumptive unreliability that attaches to accomplices' confessions that shift or spread blame can be effectively rebutted when the statements are given under conditions that implicate the core concerns of the old *ex parte* affidavit practice—that is, when the government is involved in the statements' production, and when the statements describe past events and have not been subject to adversarial questioning." *Id.* at 137.

Everything the Court said about Mark's statement in *Lilly* is true of Luis's statement too. The portion exculpating the declarant (and inculpating the accused) is not a declaration against penal interest, and at all events declarations made during custodial interrogation cannot be used against an accused. A statement, made during interrogation and blaming someone else, also is too unreliable to supply the "particularized guarantees of trustworthiness" that until *Crawford* could have supported admissibility. To the extent there is any difference between Mark Lilly's statement and Luis Murillo's, Luis's is the less reliable, because he did not inculpate himself in *any* fashion; Luis professed to have had nothing to do with the murder. If the confrontation clause forbade Virginia to use Mark Lilly's statement, how could

it allow Wisconsin to use Luis Murillo's? The state court's decision is contrary to *Lilly* because it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nonetheless arrives at a result different from [that] precedent." *Williams*, 529 U.S. at 406. Instead of offering "particularized" (i.e., statement specific) guarantees of trustworthiness, Wisconsin relied principally on the social-interest doctrine itself, which is general rather than particularized.

To the extent that it discussed the specifics of this situation, Wisconsin's appellate court thought that Luis Murillo's statement was more reliable than Mark Lilly's "because Mark was up to his neck in criminal involvement" (240 Wis. 2d at 680) while Luis denied culpability. That's backward. Mark's statement is the more reliable because he admitted some crimes, which exposed him to prosecution. Luis provided only one self-serving statement after another. Wisconsin also maintains that Luis's statement is more reliable than Mark Lilly's because Luis was emotionally overwrought, while Mark was calculating. Again this "distinction" inverts the usual understanding of reliability. We are not aware of any social science evidence supporting the proposition that emotionality guarantees accuracy. Jurors (and operators of polygraph machines) use sweating, fidgeting, and other signs of emotional stress as cues that the speaker is attempting deceit. Perhaps Luis was frightened and crying because he feared that, unless he fingered someone else, the state would put him on trial for the murder, or because he feared that no matter what he said the gang would suspect him of assisting the police and opt for revenge.

Wisconsin's "social interest" exception to the hearsay rule is itself unsupported by any data of which we are aware; the state has not cited any, either in this litigation or in the decisions creating the exception. Gang members may *boast* about their criminal exploits, or may adopt a code under

which they routinely testify (or confess) falsely in order to throw the police off the scent and then refuse to follow through at trial, exactly as Luis did. In such a subculture false allegations of criminality, far from being shameful, are normal. We need not pursue this subject, however. This unusual exception to the hearsay doctrine cannot support the use of confessions and affidavits when the long-established, and better supported, penal-interest exception does not.

Was the error harmless under *Brecht v. Abrahamson*, 507 U.S. 619 (1993)? The state says yes but does not supply much argument. Wisconsin's appellate brief devotes only two pages to the subject, more than half of that to a recap of legal rules. The brief's single paragraph devoted to the trial asserts that there was solid evidence independent of Luis's statement but does not make a serious effort to put his statement in the context of the entire trial and assess what effect it may have had. That makes it impossible to say that Luis's statement, which coming from the accused's own brother must have played a big role in jurors' evaluation, was unlikely to have had a substantial and injurious effect on the verdict. See *O'Neal v. McAninch*, 513 U.S. 432 (1995). Why would the prosecutor have introduced Luis's statement, given the considerable risk even under *Roberts*, unless he expected it to have punch and doubted the sufficiency of other evidence? The state has not furnished a sound basis for us to deem the error harmless.

AFFIRMED

A true Copy:

    Teste:

                _____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*