DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Erie County Court of Common Pleas which, following a jury trial, found appellant, Bobbi Crispin, guilty of child endangering, involuntary manslaughter, possession of cocaine and obstructing justice. For the reasons stated herein, this court affirms the judgment of the trial court.
Appellant sets forth the following five assignments of error:
 "I. THE TRIAL COURT COMMITTED ERROR WHEN IT OVERRULED DEFENDANT-APPELLANT'S CRIMINAL RULE 29 MOTION AT THE END OF THE STATE'S CASE, AND AGAIN WHEN DEFENDANT-APPELLANT RESTED FOR:
 "A. THE CONVICTION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE; AND
 "B. THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 "II. THE TRIAL COURT COMMITTED ERROR WHEN IT ENTERED CONSECUTIVE SENTENCES FOR THE OFFENSES OF ENDANGERING CHILDREN AND INVOLUNTARY MANSLAUGHTER AS THE OFFENSES ARE ALLIED OFFENSES OF SIMILAR IMPORT UNDER OHIO REVISED CODE SECTION 2941.25(A).
 "III. THE TRIAL COURT ERRED BY PERMITTING A POLICE OFFICER TO TESTIFY AS TO THE CONTENTS OF A ORAL STATEMENT MADE BY APPELLANT'S CO-DEFENDANT THAT INCULPATED THE APPELLANT, AND THEREBY VIOLATED APPELLANT'S RIGHT TO CONFRONTATION OF WITNESSES AS GUARANTEED BY THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AS WELL AS THE OHIO STATE CONSTITUTION.
 "IV. THE TRIAL COURT ERRED WHEN IT DENIED APPELLANT'S MOTION FOR A NEW TRIAL ON THE BASIS OF NEWLY DISCOVERED EVIDENCE. IN THE ALTERNATIVE, THE TRIAL COURT ERRED BY NOT GRANTING APPELLANT A CONTINUANCE TO PROPERLY PREPARE FOR THE SURPRISE WITNESS PRODUCED BY THE STATE.
 "V. THE TRIAL COURT ERRED AS A MATTER OF LAW BY FINDING APPELLANT GUILTY OF OBSTRUCTING JUSTICE AND UPON FINDING HER GUILTY, IMPOSED AN IMPROPER SENTENCE UPON HER."
The following facts are relevant to this appeal. On November 25, 1998, appellant was indicted on one count of child endangering in violation of R.C. 2919.22(A) and (E)(2)(c); one count of involuntary manslaughter in violation of R.C. 2903.04(A), with a specification of physical harm; one count of possession of cocaine in violation of R.C.2925.11(A) and (C); and one count of obstructing justice in violation of R.C. 2921.32(A)(5). All the charges resulted from events surrounding the death of appellant's two year old son, Skylar Keegan. Appellant was tried in February 1999.
At trial, the township fire chief/paramedic who responded to the emergency call at appellant's trailer testified. He testified that when he arrived at 3:48 p.m. on November 16, 1998, another paramedic who had arrived earlier was already performing CPR on Skylar who was pulse less, in respiratory arrest and in asystole which the fire chief explained was without electrical activity in the heart. The fire chief testified that the history he received was that Skylar had last been seen approximately thirty minutes before the emergency call. The paramedics attempted resuscitation for nine minutes at the scene and continued resuscitation efforts an additional five minutes during which Skylar was transported to the hospital where a medical team continued resuscitation efforts. The paramedics were unable to obtain an intravenous site for the administration of medication because Skylar was in vascular collapse which occurs when a victim is in deep shock. The fire chief testified that he observed a bruise on Skylar's forehead, some marks around his neck and bruising on his back.
A county police sergeant testified that, while he was at the hospital, he observed numerous bruises on Skylar's torso and legs, bruising underneath his throat and a fresh scrape on his face, all of which he thought was abnormal for a victim that young. Therefore, he contacted detective Sergeant Sigsworth to investigate. The sergeant also testified that he went to appellant's trailer with Sigsworth, appellant and appellant's boyfriend, Jason Krawetzki, who lived with appellant. The sergeant testified that he observed a crack pipe on the victim's bed.
Detective Sergeant Sigsworth, who was in charge of the investigation, testified that he observed the victim at the hospital after the doctors were unable to revive the victim and that the victim's body was very cold and had a large number of bruises. Sigsworth identified pictures he had taken showing the bruises on Skylar's body. Sigsworth also testified about several conversations he had with appellant during the course of his investigation.
Sigsworth first spoke with appellant on November 16, 1998, when the doctor notified appellant and Jason that Skylar was dead. Sigsworth testified that both appellant and Jason stated that Skylar got up to go to the bathroom between 2:00 and 3:00 p.m. and went back to bed; that Skylar stated that his belly button hurt; and that he was found dead by Jason. Sigsworth testified that in another interview later that same day appellant stated that when Jason went to wake Skylar at approximately 3:45 p.m., he started vomiting profusely and then was not breathing and she called 9-1-1. Sigsworth also testified that in another interview later that evening he observed a crack pipe laying on Skylar's bed; Sigsworth testified that Jason grabbed the pipe, ran into the bathroom after which Sigsworth heard the toilet flush. Jason was arrested for tampering with evidence. Sigsworth testified that when appellant was asked about Jason's use of crack cocaine, appellant stated that she never saw crack cocaine. Sigsworth testified that after appellant consented to a search of the trailer, marijuana and drug paraphernalia were found.
Sigsworth also testified that during an interview at the sheriff's office on the morning of November 17, the morning after Skylar's death, appellant told Sigsworth that the day before, she slept until 1:00 p.m.; she repeated her story that Skylar got up between 2:00 and 3:00 p.m. to go to the bathroom and she helped him back to bed; that Skylar told her his belly button hurt; and that Skylar was found dead by Jason. Appellant stated that she looked in on Skylar on one or more occasions but did not touch him. During this interview, appellant admitted that she smoked marijuana twice a month but stated that she did not use crack cocaine, that she had never seen crack cocaine in the trailer and that she had never seen Jason use crack cocaine.
Later that same day, while at appellant's trailer, the police found an additional quantity of marijuana and drug paraphernalia as well as a small bag that appeared to be cocaine. Appellant then began pointing out places in the trailer where she had seen Jason stash crack cocaine in the past. The police also obtained a urine sample from appellant which had high levels of marijuana and cocaine when tested.
Sigsworth also testified that another interview with appellant occurred later on the afternoon of November 17 at the sheriff's office. During this interview, after Sigsworth told her that Skylar had been punched and beaten to death, appellant repeated her story about Skylar getting up out of bed. Appellant admitted that she and Jason had argued before he left the trailer and that she knew Jason was possibly involved in drugs.
Sigsworth testified that during an interview with appellant on November 18, she admitted that she used cocaine as much as three times per week and that she smoked marijuana every other day. Appellant stated during this interview that she had used cocaine and smoked marijuana laced with cocaine on November 14, 1998; she also admitted that Jason smoked crack cocaine daily. She also admitted that Jason would become agitated and aggravated when he ran out of crack cocaine and she suggested that Jason might have hurt Skylar as a result of needing a fix.
On November 18, 1998, appellant agreed to undergo a polygraph test. Sigsworth learned from the polygraph pretest that appellant had been lying about Skylar getting up on the afternoon of his death. During the pretest for the polygraph, appellant admitted that she had smoked marijuana on November 15, 1998, the day before Skylar died, but stated that she was not sure if it was laced with cocaine.
Sigsworth testified that during an interview after the polygraph, when appellant was asked about why she had lied about Skylar getting up out of bed and about her drug usage, her response was that she lied because she did not want them to think she had hurt Skylar and she wanted them to believe that she was a good mother. Sigsworth also testified that appellant stated that Jason was not allowed visitation with his own son. Sigsworth testified that during an interview on December 10, 1998, appellant admitted that she had smoked marijuana on November 15, 1998, the day before Skylar died.
Sigsworth also testified about interviews with Jason. Jason admitted that he was a daily user of crack cocaine; he also stated that he fed and bathed Skylar on the day of his death while appellant slept.
The polygraph examiner who conducted two examinations of appellant testified as to the procedure used in a polygraph examination as well as the specific questions asked of appellant. During the pretest for the first polygraph conducted on November 18, 1998, when appellant was asked if she wanted to change anything she had previously told the police, she stated that Skylar had not gotten up and that he had been sleeping the whole time. As the result of the first polygraph, the examiner confirmed that appellant was truthful when she stated that she did not personally cause any injuries to Skylar. A second polygraph was conducted on December 21, 1998. As the result of the second polygraph, the examiner opined that appellant was truthful when she stated that Jason first found Skylar not breathing; that she did not see Jason hit Skylar in the stomach on Monday; and that she did not knowingly use any form of cocaine on Monday.
The emergency room doctor who attempted to resuscitate Skylar testified that when Skylar arrived at the emergency room he was in asystole, cool to the touch and his pupils were fixed and dilated. Despite medical treatment for approximately twenty minutes, Skylar did not respond and was pronounced dead. The doctor testified that his diagnosis was cardiac/respiratory arrest and suspected child abuse although he was not able to determine a cause of death. The doctor also testified that Skylar's body temperature was eighty-six degrees, in contrast to the normal body temperature of 98.6 degrees. The doctor testified that a body temperature of eighty-six degrees meant that Skylar was cold, that he had been dead for awhile although the doctor could not determine how long. From the autopsy report, the emergency room doctor stated that Skylar died from blunt force injuries to the abdomen resulting in lacerations to the bowel and arteries; almost thirty-nine percent of Skylar's blood volume was in his abdominal cavity as the result of the arterial lacerations. The doctor testified that leakage of bowel contents and blood into the abdominal cavity is a very painful experience. The doctor also testified that with very quick intervention, Skylar could have survived.
The Lucas County deputy coroner who conducted Skylar's autopsy testified that Skylar had fifteen external injuries at the time of death. Skylar had abrasions on his forehead and ear; bruises on his forehead; three bruises and one abrasion on the under surface of his chin; and bruises in several areas of the back and on the left buttock. The deputy coroner testified that these were all recent injuries and were consistent with a beating. On her internal examination, she found four hundred seventy-five cubic centimeters of blood in Skylar's abdomen, more than a third of his blood volume; a perforation of his small bowel with a bowel wall hematoma; hemorrhages in his diaphragm; two lacerations of his mesentery; a laceration of his mesenteric artery; and a subgaleal hemorrhage in the frontal and parietal regions of his head. The deputy coroner testified that Skylar's internal injuries were caused by one or two blows to the abdomen. She also testified that the rupture or perforation of Skylar's bowel would have been extremely painful because of the air from the bowel being released into the abdominal cavity. The deputy coroner testified that there would have been an interval of one hour between the arterial laceration, from which Skylar would have been bleeding profusely, and his death. She also testified that if Skylar's care givers had indicated on arrival to the emergency room that Skylar has sustained an injury to his abdomen, the doctors would have looked there first and a simple x-ray would have shown air in the abdomen from the perforated intestines and Skylar would have been sent quickly to the operating room.
A forensic toxicologist who conducted the laboratory analysis on appellant's urine sample testified as to the procedure used and the results obtained. Based upon his tests, the toxicologist concluded that appellant had been exposed to cocaine and marijuana recently before providing the urine sample. He also testified that people heavily addicted to crack cocaine develop a psychotic reaction, a paranoid delusion which is associated with an uneasiness and very often outbursts of violence that can be directed at themselves or others.
Latonya Johnson, an inmate at the Ohio Reformatory in Marysville, Ohio, who was in a transport vehicle and in a holding cell at the courthouse with appellant on the first day of trial, testified. Johnson testified that she and appellant had a conversation that lasted approximately one-half hour. In court, Johnson reviewed a statement she had sent to the county prosecutor in which Johnson stated that appellant told Johnson that appellant was present at the time of the crime; that appellant was on crack cocaine at the time of the crime; that appellant's boyfriend punched her son in the stomach and hit her because she would not go anywhere to get crack for him. Johnson also testified that appellant told her that Jason had beaten her up the day before and he beat her up again the night that everything happened. Johnson testified that appellant told her that all she saw was Jason punch Skylar in the stomach and that Skylar was crying. On direct examination, Johnson admitted that she was in Marysville for grand theft. Johnson stated that she was testifying because an innocent child was involved and that no exchanges, promises or guarantees had been made by the state in exchange for her testimony. On cross-examination, Johnson admitted that she had been convicted of other crimes.
At the close of the state's case, appellant moved for acquittal pursuant to Crim.R. 29. The motion was denied. The defense presented its case.
Timothy Keegan, Skylar's father and appellant's ex-boyfriend, testified on her behalf. Keegan testified that he had lived with appellant for four and one-half to five years until he moved out of state in March 1998; that he saw her in October 1998 and appellant indicated that she wanted to leave Jason; that appellant's children always came first in her life; and that Keegan had seen her use marijuana but had never seen her use cocaine. On cross-examination, Keegan admitted that appellant never told him that Jason used cocaine or crack cocaine; that appellant had described the place she was living in as dangerous for her; and that part of the reason she wanted to leave Jason was that she was afraid of Jason.
Appellant's ex-husband also testified on her behalf. On direct examination, appellant's ex-husband testified that he assumed custody of their two children in July 1998, because appellant lived in Fremont and they felt the school system would be better for the children where he lived. Appellant's ex-husband also testified that this was a difficult decision for appellant. On cross-examination, appellant's ex-husband admitted that he did not know that appellant had moved from Fremont in August 1998; that he did not know appellant was using drugs like cocaine; that he did not know appellant was living with Jason; and that he did not know Jason was using crack cocaine daily.
Appellant's aunt by marriage testified that appellant was a good mother; that Jason was very loving to Skylar when she saw them together on one occasion; that she had never seen any marks on Skylar when he was with her three weeks before his death; and that appellant would have removed Skylar if she thought there was any danger to him because her children came first to appellant. On cross-examination, appellant's aunt admitted that she did not know appellant was using cocaine; that she did not know Jason was using crack cocaine daily; and that a good mother would not leave her child in the care and custody of a person who used crack cocaine.
Appellant's mother testified that her ex-husband, appellant's step-father, had sexually abused appellant from about the age of nine and one-half until she was thirteen; that her step-father had given drugs to appellant; and that appellant had low self-esteem as a result of this abuse. Appellant's mother also testified that appellant had her first child at age sixteen and that appellant's first husband hit her. Appellant's mother testified that appellant was a good mother. Appellant's mother testified that she did not know appellant was using cocaine; that she did not know Jason was using crack cocaine; and that appellant would have removed Skylar if she thought there was any danger to him. Appellant's grandmother testified similarly to appellant's mother.
Appellant testified on her own behalf. Appellant testified that her step-father molested her for four to five years; that he gave her marijuana when she was eight; that he gave her cocaine when she was nine and one-half; that he would beat her up and then have sex with her; that her self-esteem was affected by all these things; and that she attempted suicide a couple of times. Appellant also testified that she had been physically abused by her ex-husband. Appellant testified about her job with the mentally challenged. Appellant admitted that she is a drug addict; she also testified that using drugs helped her feel stronger. Appellant testified that she decided for financial reasons that her two older sons should live with their father, although the initial reason was the school. Appellant also testified that she never officially moved in with Jason because she kept her own apartment in Fremont. She testified that at first she did not know Jason used drugs because he did not do drugs in front of her and he did not use drugs every single day. Appellant testified that Jason physically abused her twice: once was a shove to her chest at the beginning of their relationship and the other was the week before Skylar's death when Jason choked her; she packed her bags to leave but Jason said he was sorry and appellant forgave him and stayed.
Appellant testified that Skylar had been sick with the flu the week prior to his death. On Saturday, November 14, Jason's son came to play with her son. Appellant admitted that she did two lines of cocaine during the day and two more lines of cocaine after she put Skylar to bed. She testified that the next evening after she put him to bed, Skylar told her his stomach hurt and then he vomited. Appellant admitted that she smoked marijuana later that night. Jason woke her the next morning, told her that he had fed and bathed Skylar and had put Skylar down for a nap. She testified that Jason left the trailer; that she checked on Skylar and that because he was on his right side and facing the wall she thought he was sleeping; that around 3:00 p.m. both she and Jason's mother went into Skylar's bedroom and thought he was sleeping; and that when Jason came home, he decided that they should wake up Skylar and that was when they discovered Skylar was not breathing. Appellant testified that she does not remember talking to Sigsworth at the hospital and that when she arrived at the trailer, the police had already arrested Jason for tampering with evidence. Appellant also testified that she does not remember saying that Skylar went to the bathroom; she also testified that she had every intention of telling Sigsworth that she did not recall saying that Skylar went to the bathroom when she met with Sigsworth on the morning after Skylar's death but that she did not because Sigsworth kept hammering her with questions. Appellant also testified that Sigsworth pointed his finger at her and stated that "Skylar died because he was cracked out."
On cross-examination, appellant admitted that she told Sigsworth that before she moved in with Jason she was aware that he had two prior felony convictions, one for aggravated drug trafficking and the other for obstructing justice. Also on cross-examination, appellant admitted that not until just before the polygraph test she did tell anyone that she had lied to the doctors and lied to Sigsworth on four prior occasions about seeing Skylar on the afternoon before he was discovered dead. She also admitted that the reason she lied about her drug usage was that she did not want Sigsworth to think that she had hurt Skylar. She admitted that on the afternoon of Skylar's death when she checked him, she never touched him, she never looked to see if he was breathing and she never looked at his face. She admitted that although she had thought about leaving Jason, she was afraid to tell Jason because he was a violent person. Although she admitted talking to Latonya Johnson, appellant testified that she only answered a few questions presented by Johnson and did not tell Johnson much of what Johnson testified about.
The state recalled Sigsworth in rebuttal. Sigsworth confirmed that appellant had blurted out during one interview that Jason needed a fix and that was reason that the baby may have suffered his injuries. Sigsworth denied pointing his finger at appellant and denied stating that "Skylar died because he was cracked out."
The state also called Aaron Voltz, a supervisor for Erie County Department of Human Services, in rebuttal. Voltz testified that he was present during an interview between appellant and Sigsworth and described the interview as calm and cooperative. Voltz testified that he did not observe Sigsworth point his finger at appellant.
At the close of testimony, the motion for acquittal was renewed. The motion was denied. Following jury deliberations, appellant was convicted on all four counts.
On February 19, 1999, appellant was sentenced to a definite period of incarceration of four years on Count 1, nine years on Count 2, eleven months on Count 3 and four years on Count 4, all sentences to run consecutively.
Also, on February 19, 1999, appellant filed a motion for a new trial based upon new evidence. On March 16, 1999, appellant filed a notice of appeal. On April 13, 1999, this court remanded the case to the trial court for the trial court to rule on the motion for a new trial. On June 4, 1999, the trial court denied the motion for a new trial. On June 11, 1999, this court reinstated appellant's appeal.
In her first assignment of error, appellant argues that the trial court committed error when it overruled her Crim.R. 29 motions because her conviction of child endangering in violation of R.C. 2919.22(A)[1] was not supported by sufficient evidence and because her conviction of involuntary manslaughter in violation of R.C. 2903.04(A) was against the manifest weight of the evidence. This court finds no merit in this assignment of error.
In regard to the denial of a motion for acquittal, the standard of review was set forth by the Ohio Supreme Court in State v. Bridgeman
(1978), 55 Ohio St.2d 261, syllabus:
 "Pursuant to Crim.R. 29 (A), a court shall not order an entry of judgment of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt."
In State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, the Supreme Court of Ohio stated:
 "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."
In State v. Thompkins (1997), 78 Ohio St.3d 380, 386, the Ohio Supreme Court stated that "[t]he legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." The court also noted:
 "* * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." Id.
In contrast to sufficiency, the court stated the following in regard to weight of the evidence:
 "* * * Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence
sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief.'" (Citation omitted.) (Emphasis added by Court.) Id. at 387.
The Ohio Supreme Court also noted that when an appellate court reverses a verdict as against the weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. Id.
This court will first address appellant's argument that her conviction of child endangering in violation of R.C. 2919.22(A) was not supported by sufficient evidence. Appellant argues that the state failed to prove that she acted recklessly in violating a duty of protection, care or support which created a substantial risk to the health or safety of her child.
For a violation of R.C. 2919.22(A), the state was required to prove that appellant violated a duty of care, protection, or support thus creating a substantial risk to the health or safety of the child. An essential element of the crime of endangering children under R.C.2919.22(A) is the existence of the culpable mental state of recklessness. State v. McGee (1997), 79 Ohio St.3d 193, syllabus. R.C.2901.22(C) provides:
 "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."
A parent has a duty imposed by law to protect his or her child from abuse and to care for the child's injuries. State v. Sammons (1979),58 Ohio St.2d 460, 463. A "substantial risk" is "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C.2901.01(A)(8).
Appellant argues that there was no evidence that Jason presented a substantial risk to Skylar; no evidence that Jason was capable of beating Skylar to death; and no evidence that appellant abused Skylar, that she failed to protect him from abuse or that she knew of the abuse. Appellant's argument, however, overlooks the evidence that Jason physically abused her, the evidence that Jason was addicted to crack cocaine, and the evidence that Jason would become agitated when he needed a fix. The state presented evidence that appellant failed to protect Skylar from abuse, in that she knowingly moved in with a crack addicted individual and continued to live with this individual after he had abused her and after she knew he would become agitated when he needed a fix. The state also presented evidence, and appellant admitted, that she was a drug dependent person; the state also presented evidence that appellant left Skylar in Jason's care while she slept off the drugs she consumed the night before Skylar's death. Skylar's father and appellant's ex-boyfriend testified that appellant had described the place she was living in as dangerous for her and that part of the reason she wanted to leave Jason was that she was afraid of Jason. The state also presented evidence that appellant admitted to another inmate that she saw Jason beat Skylar and did nothing and that appellant also admitted to this inmate that appellant was smoking crack cocaine at the time Skylar sustained his injuries.
After considering the above law and the facts of this case, we find that reasonable minds could reach the conclusion that the evidence proved beyond a reasonable doubt that appellant recklessly violated a duty of protection, care, or support that created a substantial risk to the health or safety of Skylar. Thus, this court finds no merit in appellant's first argument in this assignment of error.
Appellant also argues in this assignment of error that her conviction of involuntary manslaughter was against the manifest weight of the evidence. Involuntary manslaughter, R.C. 2903.04(A), provides that "No person shall cause the death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." Appellant argues that because there was no evidence that she committed the underlying felony, child endangering, that her conviction for involuntary manslaughter was against the manifest weight of the evidence. This court finds no merit in appellant's argument as this court found there was sufficient evidence for appellant's conviction for child endangering.
Accordingly, appellant's first assignment of error is found not well-taken.
In her second assignment of error, appellant argues that the trial court erred in entering consecutive sentences for the offenses of child endangering and involuntary manslaughter because these are allied offenses. This court finds no merit in this assignment of error.
The record indicates appellant failed to raise this allied offense argument in the trial court in the case sub judice. The Ohio Supreme Court has held that any claim of error in regard to allied offenses is deemed to be waived if not raised in the trial court. State v. Comen
(1990), 50 Ohio St.3d 206, 211. See, also, State v. Powell (1993),87 Ohio App.3d 157, 169.
Accordingly, appellant's second assignment of error is found not well-taken.
In her third assignment of error, appellant argues that the trial court committed error by permitting a police officer to testify as to an oral statement made by appellant's boyfriend, Jason, who invoked hisFifth Amendment privilege and, thus, was unavailable to testify at her trial. This court finds no merit in this assignment of error.
Specifically, the police officer testified that, after he read Jason his Miranda warnings, Jason admitted that he used crack cocaine daily; that Jason stated that he fed, bathed and cared for Skylar while appellant slept until Jason woke appellant at one o'clock and he left the trailer; and that prior to his leaving, no one else was in the trailer other than appellant, Skylar and him. Appellant challenges the ruling of the trial court, which permitted Jason's out-of-court statements to be admitted against her. Specifically, appellant argues that Jason's statements fail to meet the requirements for admissibility pursuant to Evid.R. 804(B), because there were no corroborating circumstances to indicate the trustworthiness of Jason's statements. The state counters that the trial court permitted the admission of the statements pursuant to Evid.R. 804(B)(3) consistent with the authority of State v. Gilliam
(1994), 70 Ohio St.3d 17, and, as such, did not violate the Confrontation Clause.
Evid.R. 804(B)(3) provides in pertinent part:
"(B) Hearsay exceptions.
 "The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:
"* * *
 "(3) Statement against interest. A statement that * * * at the time of its making * * * so far tended to subject the declarant to civil or criminal liability, * * * that a reasonable person in the declarant's position would not have made the statement unless the declarant believed it to be true. A statement tending to expose the declarant to criminal liability, whether offered to exculpate or inculpate the accused, is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."
Under the rule of Ohio v. Roberts (1980), 448 U.S. 56, the veracity of hearsay statements is sufficiently dependable to satisfy the Confrontation Clause of the federal constitution's Sixth Amendment in allowing the untested admission of such statements against an accused when the evidence (1) falls within a firmly rooted hearsay exception, or (2) contains particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to the statements' reliability. Thus, to be admissible, Jason's statements must meet one of the prongs of the test set forth in Roberts.
In the case sub judice, the trial court allowed Jason's statements to be admitted through the testimony of Sigsworth in reliance on State v.Gilliam, supra, which held that the reliability standard can be satisfied without more in a case where the evidence falls within a firmly rooted hearsay exception and then determined that a statement against interest was a firmly rooted hearsay exception. However, subsequent to the trial court's determination in the case sub judice, the United States Supreme Court in Lilly v. Virginia (1999), 527 U.S. 116, considered the use of statements against penal interest to incriminate a criminal co-defendant when offered by the prosecution in the absence of the declarant. The Supreme Court held that such statements do not categorically satisfy Confrontation Clause concerns.[2] In reliance on the U.S. Supreme Court's decision in Lilly, supra, the Ohio Supreme Court in State v.Madrigal (2000), 87 Ohio St.3d 378, paragraph two of the syllabus, held an accomplice's confession that inculpates a criminal defendant is not within a firmly rooted exception to the hearsay rule as that concept has been defined by Confrontation Clause jurisprudence. Thus, the Ohio Supreme Court overruled Gilliam to the extent it is inconsistent withMadrigal. Id., paragraph two of the syllabus. Therefore, Jason's hearsay statements would be admissible at appellant's trial only if they exhibit a guarantee of trustworthiness or indicia of reliability.
From this court's review of Sigsworth's testimony, which incorporates the hearsay statements made by Jason, it cannot be said that his "truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility." Idaho v. Wright
(1990), 497 U.S. 805, 820. Therefore, we find that Jason's statements made to Sigsworth fail to meet either prong of the test as set forth inOhio v. Roberts and, thus, their admission at trial violated appellant's Confrontation Clause rights.
However, this court must then determine whether this error was prejudicial or harmless. To hold that a federal constitutional error is harmless, this court must be able to declare a belief that the error was "harmless beyond a reasonable doubt." Chapman v. California (1967)386 U.S. 18, 23. In Harrington v. California (1974), 395 U.S. 250, the United States Supreme Court held that where the evidence supplied in violation of a constitutional right was merely cumulative and the other evidence was overwhelming, the reviewing court could conclude beyond a reasonable doubt that the denial of the accused's constitutional rights was harmless error.
Applying the foregoing standards to the record before us, we find that the error in permitting Sigsworth to testify as to Jason's statements was harmless beyond a reasonable doubt as the substance of the police officer's testimony concerning Jason's out of court statement[3] was either what the same police officer testified that appellant herself admitted to him[4] or that which appellant admitted in her testimony.[5] Therefore, even if the trial court's admission of the police officer's testimony concerning Jason's statements to the officer violated appellant's right to cross-examination, any such error was harmless as the testimony was already before the jury from either appellant's own testimony or the police officer's testimony of appellant's admissions to him. As such, we find that upon a careful review of the evidence before us, disregarding the testimony admitted in error, the state presented compelling evidence of appellant's guilt and we can conclude beyond a reasonable doubt that the denial of appellant's constitutional rights was harmless error.
Accordingly, appellant's third assignment of error is found not well-taken.
In her fourth assignment of error, appellant argues that the trial court erred in denying her motion for a new trial based on newly discovered evidence or, alternatively, in not granting appellant a continuance to properly prepare for a surprise witness produced by the state. This court finds no merit in this assignment of error.
In regard to appellant's argument that the trial court erred in failing to grant a continuance, appellant's argument fails because appellant did not move for a continuance.
Appellant also argues that the trial court erred in denying her motion for a new trial based on newly discovered evidence. After conviction, appellant filed a motion for a new trial. In support of the claim of newly discovered evidence, appellant offered the affidavits of two witnesses, inmates at Marysville, tending to impeach or contradict the testimony of Latonya Johnson, another inmate at Marysville, who testified on behalf of the state.
As stated by the Ohio Supreme Court in State v. Lopa (1917),96 Ohio St. 410, 411:
 "The granting of a motion for a new trial upon the ground named is necessarily committed to the wise discretion of the court, and a court of error cannot reverse unless there has been a gross abuse of that discretion. * * * The new testimony proffered must neither be impeaching nor cumulative in character. * * *" See, also, State v. Petro (1947), 148 Ohio St. 505, syllabus.
In the case sub judice, the newly discovered evidence proffered on the motion for a new trial was merely impeaching or at most cumulative. InState v. Petro, 148 Ohio St. at 509, the Supreme Court, following Lopa, held that the denial of a motion for a new trial based upon an affidavit that was merely impeaching or at most cumulative was not error.
Applying the above law to the facts of this case, this court finds that the trial court did not err in denying appellant's motion for a new trial based on newly discovered evidence or, alternatively, in not granting appellant a continuance to properly prepare for a surprise witness produced by the state.
Accordingly, appellant's fourth assignment of error is found not well-taken.
In her fifth assignment of error, appellant argues that the trial court erred as a matter of law by finding her guilty of obstructing justice and imposing an improper sentence upon her. This court finds no merit in this assignment of error.
In this assignment of error, appellant first argues that because Jason was already in custody for tampering with evidence, she could not be guilty of hindering his discovery, apprehension, prosecution, conviction or punishment in regard to tampering with evidence. The state argues that appellant knowingly deceived the investigating officers as to the circumstances surrounding her child's death in that she lied about her knowledge of Jason's drug use and she lied about Skylar's activity on the day of his death in that she lied several times about Skylar getting up from bed and going to the bathroom less than an hour before he was discovered dead.
R.C. 2921.32(A)(5) provides in pertinent part:
 "(A) No person, with purpose to hinder the discovery, apprehension, prosecution, conviction, or punishment of another for crime or to assist another to benefit from the commission of a crime, * * * shall do any of the following:
"* * *
"(5) Communicate false information to any person."
In State v. Bailey (1994), 71 Ohio St.3d 443, syllabus, the Ohio Supreme Court held that the making of unsworn false oral statements to a law enforcement officer with the purpose to hinder the officer's investigation of a crime is punishable conduct within the meaning of R.C. 2921.32(A)(5). See, also,_State v. Bolyard (1990), 68 Ohio App.3d 1.
R.C. 2921.32 does not specify the degree or method of proof required to show that an underlying crime was committed. The record in the case contains evidence that Skylar's death was a homicide, not an accident, thus satisfying the requirement that the state must prove that a crime was in fact committed in order to convict a defendant for obstruction of justice. State v. Bronaugh (1980), 69 Ohio App.2d 24. The record also contains evidence that Skylar, appellant and Jason were the only people at the trailer on the morning of Skylar's death and that appellant admitted to Latonya Johnson that Jason punched Skylar in the stomach. We do not believe that the state must prove that Jason in fact murdered Skylar. See, Bronaugh (state has to show that an underlying crime has been committed, not that the person being illegally assisted committed the underlying crime beyond a reasonable doubt). We do believe that proof of appellant's false statements to the police officers that Skylar got up between 2:00 and 3:00 p.m. on the day he died and false statements about Jason's crack cocaine use would constitute a sufficient basis for a jury determination that the false statements were given with a purpose to hinder the prosecution, conviction or punishment of Jason for Skylar's death. Thus, there was sufficient proof of each element of the crime.
In this assignment of error, appellant also argues that she was improperly sentenced for obstructing justice, again basing her argument on the premise that the drug offenses committed by Jason were either fourth or fifth degree felony charges and ignoring the charges against Jason resulting from Skylar's death. Appellant was sentenced for a third degree felony for obstructing justice.
R.C. 2921.32(B) provides in pertinent part:
 "(B)(1) Whoever violates this section is guilty of obstructing justice.
"* * *
 "(3) Except as otherwise provided in division (B)(4) of this section, if the crime committed by the person aided is a felony or if the act committed by the child aided would be a felony if committed by an adult, obstructing justice is a felony of the fifth degree.
 "(4) If the crime committed by the person aided is aggravated murder, murder, or a felony of the first or second degree or if the act committed by the child aided would be one of those offenses if committed by an adult and if the offender knows or has reason to believe that the crime committed by the person aided is one of those offenses or that the act committed by the child aided would be one of those offenses if committed by an adult, obstructing justice is a felony of the third degree." (Emphasis added.)
Provided that a sentence is within the sentencing limits proscribed for a conviction, sentencing is left within the sound discretion of the trial court. City of Toledo v. Reasonover (1965), 5 Ohio St.2d 22; State v.Longo (1982), 4 Ohio App.3d 136 . Absent an abuse of discretion, the decision of the trial court will be affirmed upon appeal. State v. Tutt
(1988), 44 Ohio App.3d 138 . It has been recognized that a trial court may consider information which would normally be inadmissible at trial, such as that included in presentence reports. State v. Barker (1978),53 Ohio St.2d 135, 150-51; Tutt, supra at 139.
In the case sub judice, at the sentencing hearing, the trial court stated it had reviewed the presentence report. The presentence report indicates that Jason was indicted for murder. Thus, the trial court had evidence that "the crime committed by the person aided is * * * murder" and thus, properly sentenced appellant for a felony of the third degree.
Accordingly, appellant's fifth assignment of error is found not well-taken.
On consideration whereof, the court finds that the defendant was not prejudiced or prevented from having a fair trial, and the judgment of the Erie County Court of Common Pleas is affirmed. It is ordered that appellant pay court costs for this appeal.
Melvin L. Resnick, J., Mark L. Pietrykowski, P.J..
 ____________________________ George M. Glasser, J.
JUDGE
Judge George M. Glasser, retired, sitting by assignment of the Chief Justice of the Supreme Court of Ohio.
[1] R.C. 2919.22(A) provides in pertinent part:
 "(A) No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support. * * *"
[2] The four-member plurality in Lilly divided the category of statements against penal interest into three subcategories: (1) those used as voluntary admissions against the declarant; (2) those used as exculpatory evidence offered by a defendant who claims that the declarant committed, or was involved in, the offense; and (3) those used as evidence offered by the prosecution to establish the guilt of an alleged accomplice of the declarant. Id., 527 U.S. at 127. The last category does not fall into a firmly rooted hearsay exception. Id.,527 U.S. at 134.
[3] The police officer testified that Jason admitted that he used crack cocaine daily; that Jason stated that he fed, bathed and cared for Skylar while appellant slept until Jason woke appellant at one o'clock and he left the trailer; and that on one else was in the trailer other than appellant, Skylar and him on the day Skylar died.
[4] The same police officer testified that appellant admitted to him that she and Jason were at the trailer on the day Skylar died; that she slept until 1:00 p.m. on the day Skylar died; and that Jason smoked crack cocaine daily.
[5] Appellant testified that Jason woke her about 1:00 p.m. and told her he had fed and bathed Skylar and put him down for a nap and then Jason left the trailer. Appellant also testified that Jason smoked crack cocaine daily.